IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

FILED
U.S. DISTRICT COURT
AUGUSTA DIV.

2018 DEC 21   PM 4: 17

CLERK _M. akins_
SO. DIST. OF GA.

Kay Lynette Gresham
_____
_____

*(Write the full name of each plaintiff who is filing
this complaint. If the names of all the plaintiffs
cannot fit in the space above, please write "see
attached" in the space and attach an additional
page with the full list of names.)*

-against-

DaVita Healthcare Partners, Inc.
_____
_____

*(Write the full name of each defendant who is
being sued. If the names of all the defendants
cannot fit in the space above, please write "see
attached" in the space and attach an additional
page with the full list of names.)*

**Complaint for Employment
Discrimination**

Case No. **CV118-0222**
_____
*(to be filled in by the Clerk's Office)*

Jury Trial:     ☐ Yes   ☐ No
                *(check one)*

## I.    The Parties to This Complaint

### A.    The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint.  Attach additional pages if needed.

Name — Kay L Gresham
Street Address — 2134 Chadwick Road
City and County — Augusta, Richmond
State and Zip Code — GA 30906
Telephone Number — (706) 993-5186
E-mail Address — greshamKL @ gmail.com

### B.    The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation.  For an individual defendant, include the person's job or title (if known).  Attach additional pages if needed.

Defendant No. 1

Name — DaVita Healthcare Partners, Inc.
Job or Title (if known) —
Street Address — 717 17th Street
City and County — Denver
State and Zip Code — CO 80202
Telephone Number — 800-381-7063
E-mail Address (if known) —

Defendant No. 2

Name — Tammy Price
Job or Title (if known) — Group Facility Administrator
Street Address —
City and County —

State and Zip Code          SC

Telephone Number           (864) 980- 8230

E-mail Address             tammy. price @ davita. com
(if known)

Defendant No. 3

    Name                       Marissa Freedman

    Job or Title               Regional Operations Director
    (if known)

    Street Address             _____

    City and County            _____

    State and Zip Code         NC

    Telephone Number           617- 692 - 0021

    E-mail Address             marissa. freedman @ davita. com
    (if known)

Defendant No. 4

    Name                       _____

    Job or Title               _____
    (if known)

    Street Address             _____

    City and County            _____

    State and Zip Code         _____

    Telephone Number           _____

    E-mail Address             _____
    (if known)

**C.    Place of Employment**

The address at which I sought employment or was employed by the defendant(s) is:

    Name                   Davita Dialysis

    Street Address         1815 Wylds Road

    City and County        Augusta, Richmond

    State and Zip Code     GA   30909

    Telephone Number       706 - 733 - 0522

3

## II.   Basis for Jurisdiction

This action is brought for discrimination in employment pursuant to *(check all that apply)*:

☑   Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (race, color, gender, religion, national origin).

*(Note:  In order to bring suit in federal district court under Title VII, you must first obtain a Notice of Right to Sue letter from the Equal Employment Opportunity Commission.)*

☑   Age Discrimination in Employment Act of 1967, as codified, 29 U.S.C. §§ 621 to 634.

*(Note:  In order to bring suit in federal district court under the Age Discrimination in Employment Act, you must first file a charge with the Equal Employment Opportunity Commission.)*

☐   Americans with Disabilities Act of 1990, as codified, 42 U.S.C. §§ 12112 to 12117.

*(Note:  In order to bring suit in federal district court under the Americans with Disabilities Act, you must first obtain a Notice of Right to Sue letter from the Equal Employment Opportunity Commission.)*

☐   Other federal law *(specify the federal law)*:

_____

☐   Relevant state law *(specify, if known)*:

_____

☐   Relevant city or county law *(specify, if known)*:

_____

## III.   Statement of Claim

Write a short and plain statement of the claim.  Do not make legal arguments.  State as briefly as possible the facts showing that each plaintiff is entitled to the damages or other relief sought.  State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct.  If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph.  Attach additional pages if needed.

4

A.   The discriminatory conduct of which I complain in this action includes *(check all that apply)*:

☐   Failure to hire me.

☑   Termination of my employment.

☑   Failure to promote me.

☐   Failure to accommodate my disability.

☐   Unequal terms and conditions of my employment.

☑   Retaliation.

☐   Other acts *(specify)*: _____

*(Note: Only those grounds raised in the charge filed with the Equal Employment Opportunity Commission can be considered by the federal district court under the federal employment discrimination statutes.)*

B.   It is my best recollection that the alleged discriminatory acts occurred on date(s) **5/10/17**

C.   I believe that defendant(s) *(check one)*:

☐   is/are still committing these acts against me.

☑   is/are not still committing these acts against me. **only because I was wrongfully terminated.**

D.   Defendant(s) discriminated against me based on my *(check all that apply and explain)*:

☑   race **I am Black.**

☐   color _____

☐   gender/sex _____

☐   religion _____

☐   national origin _____

☑   age.  My year of birth is **1964**.  *(Give your year of birth only if you are asserting a claim of age discrimination.)*

☐   disability or perceived disability *(specify disability)*
_____

E.   The facts of my case are as follows.  Attach additional pages if needed.

I started working as a Facility Administrator on 5/31/16. I assumed responsibility for the clinic on 9/30/16. The clinic had majority black staff and teammates. Audit revealed discrepancies in Oct 2016. My supervisor, Tammy Price, wrote up most of the staff, but not me. The infractions predated my employment. The Facility Administrator during the time period was promoted and not written up. I had an annual performance eval in Mar 2018. Overall score of "3". Told to fire 3 employees, I hesitated. I was placed on PIP. 60 days later I was fired. PIP reasons included the infraction. The previous PA was never placed on a PIP and is still employed. I was never counseled regarding performance. Please refer to detailed attached documents. The PIP was unreasonable and contradictory. I was held to a different standard than the other white, young Facility Administrators. In addition, my salary was less than my white colleagues in the same job with less education.

*(Note: As additional support for the facts of your claim, you may attach to this complaint a copy of your charge filed with the Equal Employment Opportunity Commission, or the charge filed with the relevant state or city human rights division.)*

IV.   **Exhaustion of Federal Administrative Remedies**

    A.    It is my best recollection that I filed a charge with the Equal Employment Opportunity Commission or my Equal Employment Opportunity counselor regarding the defendant's alleged discriminatory conduct on *(date)*

        7/24/17

    B.    The Equal Employment Opportunity Commission *(check one)*:

        ☐    has not issued a Notice of Right to Sue letter.

        ☑    issued a Notice of Right to Sue letter, which I received on *(date)*

        9/24/18

        *(Note: Attach a copy of the Notice of Right to Sue letter from the Equal Employment Opportunity Commission to this complaint.)*

    C.    Only litigants alleging age discrimination must answer this question.

        Since filing my charge of age discrimination with the Equal Employment Opportunity Commission regarding the defendant's alleged discriminatory conduct *(check one)*:

        ☑    60 days or more have elapsed.

        ☐    less than 60 days have elapsed.

V.   Relief

State briefly and precisely what damages or other relief the plaintiff asks the court to order. Do not make legal arguments. Include any basis for claiming that the wrongs alleged are continuing at the present time. Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts. Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages.

I am requesting back wages for the Promotion Position (Outreach Development Manager) that I was denied. I am requesting the PTO I lost and that I would have earned. I am requesting the tuition reimbursement I was denied ($3,000.00). I am seeking the full annual bonus I would have received. I am also asking for reimbursement of legal and court costs, compensatory damages, and Punitive damages. I did not obtain full-time employment until Sept 17, 2018. I would like the 1 year salary of the Outreach Manager, fringe benefits for 1 year, 401(K) lost, assurance of a positive job reference check, and an apology.

VI.   Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

A.   For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:  12/21/20 18

Signature of Plaintiff   Kay L. Gresham

Printed Name of Plaintiff   Kay L. Gresham

**B.**     **For Attorneys**

Date of signing: _____, 20__.

| | |
|---|---|
| Signature of Attorney | _____ |
| Printed Name of Attorney | _____ |
| Bar Number | _____ |
| Name of Law Firm | _____ |
| Address | _____ |
| Telephone Number | _____ |
| E-mail Address | _____ |

EEOC Form 161 (11/16)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### DISMISSAL AND NOTICE OF RIGHTS

| To: | Kay L. Gresham<br>2134 Chadwick Road<br>Augusta, GA 30906 | From: | Atlanta District Office<br>100 Alabama Street, S.W.<br>Suite 4R30<br>Atlanta, GA 30303 |
|---|---|---|---|

|  | On behalf of person(s) aggrieved whose identity is<br>CONFIDENTIAL (29 CFR §1601.7(a)) | | |

| EEOC Charge No. | EEOC Representative | | Telephone No. |
|---|---|---|---|
| 410-2017-05443 | Deante Topps,<br>Investigator | | (404) 562-6971 |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

[ ] The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ] Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

[ ] The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[ ] Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

[X] The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

[ ] The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[ ] Other (briefly state)

### - NOTICE OF SUIT RIGHTS -

(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

Bernice Williams-Kimbrough,
District Director

SEP 1 2 2018
(Date Mailed)

Enclosures(s)

cc:   **DAVITA, INC.**
Shelley R. McCoy, Esq., (for Respondent)

Enclosure with EEOC
Form 161 (11/16)

# INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS    --    Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA), the Genetic Information Nondiscrimination Act (GINA), or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days** of the date you *receive* this Notice. Therefore, you should **keep a record of this date**. Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was *mailed* to you** (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Courts often require that a copy of your charge must be attached to the complaint you file in court. If so, you should remove your birth date from the charge. Some courts will not accept your complaint where the charge includes a date of birth. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

**PRIVATE SUIT RIGHTS    --    Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than 2 years (3 years) before you file suit** may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit **before 7/1/10** -- *not* 12/1/10 -- in order to recover unpaid wages due for July 2008. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice **and** within the 2- or 3-year EPA back pay recovery period.

**ATTORNEY REPRESENTATION    --    Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do **not** relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND EEOC ASSISTANCE    --    All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, **please make your review request within 6 months** of this Notice. (Before filing suit, any request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*

August 20, 2018


Deante Topps, Federal Investigator
U. S. Equal Employment Opportunity Commission
Atlanta District Office
100 Alabama Street SW Suite 4R30
Atlanta, GA 30303


Re: Charge No. 410-2017-05443

Dear Investigator Topps:

This letter is a rebuttal response to the respondent (DaVita, Inc.) position dated June 18, 2018.  The respondent response is not accurate, and I am asking EEOC to continue investigating the charge of employment discrimination filed on July 24, 2017.  Attached to this letter are documents to support the charge and the contact information for witnesses to support the relevant facts of the charges of race and age discrimination and retaliation.

I.    Introduction

    After successfully completing five separate interviews, on May 5, 2016, I was offered employment with DaVita Healthcare Partners, Inc. as the Facility Administrator (FA) at Wylds Road Dialysis Center (Facility) in Augusta GA. The starting date for the position was May 31, 2016.  The annual salary was set at $76,000.00 and eligibility for an annual performance bonus between $0 and $11,400, pro-rated based upon the date of hire.  In addition, a retention bonus agreement was entered for the total amount of $3000.00 with 2 equal payments of $1500 to be made on or about December 9, 2016 and June 9, 2017.  Per the agreement, DaVita reserved the right to rescind, change or amend all or part of the retention bonus.

    In retrospect, based upon how I had new employee training and the office space assignment, I was set up for failure.  I reported to work at DaVita on May 31, 2016.  When I arrived at 9am, the Administrative Assistant and the entire clinic (medical director, nurses, technicians, and patients) had not been made aware that I had been hired and would start work on that day.  I did not get an office space in the Wylds Road facility until September 2016.  For almost four months I did not have a designated office space, which made it difficult for me to find a quiet place to take required new employee trainings. Sometimes I sat in the breakroom, conference room, nurse exam room, or dietician desk.  Meanwhile Mr. Nathan McClure (white/ 20+), who was hired a few weeks after me to manage the South Augusta clinic immediately went into a designated space at his clinic.  But at Wylds Road, the facility administrator

office space was occupied by Jaryl Erwin (white female//40+) the outgoing manager. Ms. Erwin had been promoted to open a brand-new facility in Evans, GA but had not transferred to that location. I was hired to manage a clinic that someone else (Jaryl Erwin) was already managing and further, she was not assigned to train me (be my preceptor) in the position at that clinic.

New employee training for me ended on September 30, 2016. During the four months of new employee training, I traveled numerous times to Greenville SC to meet with my assigned preceptor, Kevin Donovan (white male). Mr. Donovan never traveled to Augusta to conduct one-on-one training with me; therefore, the responsibility for my training was solely placed on me. On the other hand, my own supervisor/the Group Facilitator Administrator, Tammy Price (white female/ 40+), trained Nathan McClure (white male/20+) one-on-one. The distance between the South Augusta clinic and Wylds Road facility is 3.9 miles; close enough for GFA Price to train me in my clinic as she did with Mr. McClure. Whereas I had to travel roundtrip 232 miles to Mr. Donovan, and this required an overnight stay. As a result, I was away from the clinic where I was assigned to manage and not provided contextual training that related to the specific clinic in which I was hired.

In addition to the required new employee trainings for facility administrators, I voluntarily attended a week-long basic training for dialysis technicians and nurses that did not have prior experience working in dialysis. The basic training course is critical, because at the end of the week new employees must successfully pass an exam; if they do not, their employment is terminated. I voluntarily took the exam at the end of the week (the class and exam were not a requirement for my position because I was hired as a non-clinical facility administrator). I passed the exam with an exceptional score. This signifies that I did grasp DaVita's business and understood dialysis. I am not mentally delayed, nor do I have cognition issues.

In contrast to the respondent statement, I did not have numerous training and coaching sessions as did my white counterparts with this same company. The instruction provided by the Group Facility Administrator (Tammy Price) and Clinical Services Specialist (Susan Bass) was standard for any new non-clinical Facility Administrator. In fact, the limited training I received was substandard to the orientation provided to Nathan McClure and Michelle Loggins (white female/30+). Mr. McClure and Ms. Loggins are non-clinical Facility Administrators just as I was. In accordance with Federal and State Accreditation standard, their assigned facilities as well were required to hire Clinical Coordinators. GFA Price and ROD Freedman response that this was done because I was incompetent, is a lie. The accreditation policy is that, if a facility has a non-clinical facility administrator, a registered nurse must be hired as the Clinical Coordinator.

Prior to receiving the Performance Improvement Plan (PIP) on May 10, 2017, I was never told during any meeting held with me or my teammates that it was a coaching session. Nor is there any written documentation of any coaching sessions. Even after being given the written 60-day PIP, neither Tammy Price nor Marissa Freedman, Regional Operations Director, met with me at any time to provide feedback as outlined in the policy of DaVita. This is totally a noncompliant matter, and was purposely orchestrated toward me, a Black woman.

I clearly understood the role as the Leader of the facility. I came to DaVita with a background in Behavioral Health Administration. I was a successful professional with over 25 years of experience. In addition, to the years of professional experience, I am highly educated. I have a Doctorate in Social Welfare Administration with an emphasis in Health Care Policy and Administration. GFA Price and ROD Freedman were intimidated and felt threatened by me due to my race once they realized the level of my education. Jaryl Erwin, RN (white/40+) the previous FA at Wylds Road, would always comment that I was very smart and was apprehensive towards me. Ms. Erwin expressed that the teammates seemed to respond better to me and that I had a better rapport. This comment occurred after I planned a social outing and more teammates attended than what Ms. Erwin had organized months earlier. This signifies that I was respected as the leader of the facility. My level of expertise and organizational skills were utilized to successfully carrying out this endeavor. An air of jealousy was exhibited by my "support team" since I accomplished this without their input, help or assistance. This set-up was supposed to be another failure by the "Black woman". My professionalism rose to the challenge, when they expected failure.

I did not have performance issues and the metrics for the facility improved during the period in which I was employed. GFA Price and ROD Freedman did not conduct weekly one-on-one sessions with me. In fact, I became concerned with the lack of communication and feedback from GFA Price as my immediate supervisor. I was isolated and was ostracized by the two White women who were supposed to conduct the one-on-one sessions. Clinic performance outcomes were discussed with Susan Bass, the Clinical Support Specialist, when she made monthly visits to my clinic (Ms. Bass job was to visit every clinic monthly or as often as necessary to help improve clinical outcomes). Ms. Bass commented positively when the clinical outcomes showed continued improvement.

In March 2017, I applied for a promotion on the Division level to Outreach Development Manager after reviewing the DaVita company policy to see the requirements for how long I had to be in my current position before I could

apply for another job. I spoke with Natasha Jones (Hispanic) Hiring Manager, whom I had interacted with in multiple occasions regarding candidates for positions at my clinic. Ms. Jones encouraged me to apply for the promotion. At the time of the application submittal, I had not received any negative feedback concerning my performance. I notified ROD Freedman in person that I had applied. Months later in May when I had not heard back from anyone regarding scheduling an interview, I contacted Ms. Jones to discuss the merits of my application. Ms. Jones did not know that I was not interviewed and stated that I was the most qualified applicant. Ms. Jones stated that she had spoken with ROD Freedman and expressed positive comments about my qualifications for the position. This accolade was intimidating and caused resentment towards me from ROD Freedman and GFA Price. I am a well-qualified Black woman. Neither ROD Freedman or GFA Price have beyond 2-4 years of technical training or college.

After realizing that I had been purposely overlooked for the Outreach Development Manager position, Ms. Jones initiated a review of current job positions she was recruiting for in the region (Georgia, Florida and South Carolina) that she thought I was qualified and suggested two positions. Ms. Jones contacted me a week later to see if I had applied for either position. I had not applied because the PIP had been given to me; therefore, I was not eligible to apply for another job. In my opinion, the PIP was done to prevent me from excelling and advancing within DaVita due to scrupulously prejudicial attitudes. Ironically, GFA Price and ROD Freedman assigned me to team up with 3 other teammates to do outreach. I along with teammate, Veronica Stone, visited local hospitals to speak with staff and leave brochures about DaVita. I was assigned the additional duty to do outreach locally and the irony is that ROD Freedman and GFA Price state I was not considered for the Outreach Development Manager position because of my performance. It was obvious that I was expected to be a puppet and stay in my place. This treatment is further evidence of their scrupulous vindictiveness toward me, a Black well-educated woman. What I was told to do regarding local outreach, should have been done by the teammate that had been promoted out of that position. Outreach efforts locally can be verified by contacting witness, Veronica Stone (black/ Administrative Assistant).

To further prove a fraudulently orchestrated attempt to discredit me, an African American well-educated woman, I received an annual performance bonus on March 10, 2017 in the amount of $4007.56. The amount of the bonus is determined by the rating I received on my performance. The retention bonus was not rescinded, changed or amended. Payment for the retention bonus was received on payroll dates: December 23, 2016 and July 7, 2017. In addition to the above bonuses, I received a victory bonus on June 23, 2017, in the amount of $343.90. It is with certainty that bonuses are not

rewarded and/or awarded to incompetent persons as illustrated in DaVita's response. I am not incompetent, and my performance bonus proves the same. This once again proves my firing to be based on an orchestrated attempt by White counterparts to discredit me, a well-educated Black woman whose credentials were affording her greater opportunities within the company.

I experienced discrimination and retaliation during my employment with DaVita. The demands and attitude of GFA Price and ROD Freedman was demeaning and degrading. As a black Facility Administrator, I was used to get rid of teammates (primarily black) they did not want employed at the facility. When I expressed resistance with delivering the terminations, GFA Price and ROD Freedman became angry with me. Shortly after the last teammate was terminated, I was placed on a 60-day performance improvement plan. I went from receiving accolades for steering the facility federal/state recertification in April to receiving the PIP in May. I was treated differently than the other facility administrator previously at the facility when the clinical outcomes were in fact worse. The previous Facility Administrator, Jaryl Erwin (white), was not given a PIP and under her management labor and clinical outcomes were extreme issues.

I did not bring up concerns of discrimination to Tammy Price, Marissa Freedman, or People Services/Teammate Relations. I did have numerous conversations with other black teammates about the blatant difference in treatment towards teammates of color, including me. One former DaVita employee, Sarah Harrison (black/nurse) approached the DaVita VP, Kenny Gardner, in the parking lot after his facility visit at Wylds Road, to discuss her concerns with the racial climate. The distress in the treatment I received from GFA Price and ROD Freedman, was mentally and physically exhausting. I contacted the Employment Assistance Program for a referral to receive mental health counseling. I chose to see and pay a private therapist for counseling not affiliated or paid by DaVita. During these sessions, I have confidentially shared my feelings towards the racial and age discriminatory culture of DaVita and my supervisors. My supervisors were white and younger in age. It is mentally agonizing that they could discriminate and retaliate against me and not be held accountable but continue to advance with DaVita.

I was not responsible for whatever discipline was issued to teammates. GFA Price and ROD Marissa Freedman did not allow me as the facility administrator to operate independently; especially when it came to personnel matters. GFA Price and ROD Freedman were very punitive towards my black staff. At every visit GFA Price made to the facility, she would come in and complain that a teammate was doing something wrong. Instead of taking the

approach to coach and train, GFA Price and ROD Freedman would address me in a condescending manner and say how the teammates needed to be written up. I never stated to GFA Price nor ROD Freedman that I did not like to discipline teammates. As an experienced Administrator, I have had to initiate corrective actions in the past. The discomfort I expressed along with the comment I made was that "I live here in the city of Augusta" (GFA Price lives in South Carolina and ROD Freedman lives in North Carolina) related to my feeling as though I was being a pawn (scapegoat) to get rid of teammates without justification. I feared how the community would respond to me after learning that I was used by "the white people" to get rid of the "black teammates".

Exhibit A: Offer Letter
Exhibit B: Pay Stubs
Exhibit C: Facility Administrator Job Description
Exhibit D: Outreach Development Manager Job Description
Exhibit E: Kay Gresham, PhD Resume
Exhibit F: Email from Susan Bass regarding anticipated clinic score

## II.  Factual Background

### A.  DaVita is not committed to providing a discrimination, harassment, and retaliation-free workplace.

While DaVita attempts to place emphasis on their seven core values, the reality is that DaVita does not care about employees. DaVita makes business decisions that violate their core values. Nationally, DaVita has several pending lawsuits. One complaint being brought by current and past DaVita employees claims the clinics are understaffed and that the rapid pace of care is maintained to maximize profits at the exploitation of teammates and to the safety jeopardy of patients. Most of DaVita's patients are Medicare or Medicaid recipients; therefore, the charge for services is billed much less than private insurance. Hence, Facility Administrators are forced to cut labor and pressure teammates to do work off the clock. The second lawsuit accuses DaVita of sex, age, and disability discrimination against female employees. All of this speaks to the corporate culture of DaVita.

### B.  I, Kay Gresham, did not struggle in my role as a Facility Administrator.

I started working for DaVita on May 31, 2016. I did not have previous experience working in dialysis, but I had 16 years of professional experience as an Administrator. It is not uncommon for DaVita to hire teammates that do not have previous experience working in dialysis. This

is the reason DaVita initiated the STAR program. In the STAR program, DaVita recruits' individuals with a variety of backgrounds and provides intensive classroom training for three months and hands on job training that is supervised by a preceptor. At the time in which I was hired to work for DaVita, three of the four local facilities needed Facility Administrators. In addition, there was a significant shortage of nurses and patient care technicians. Because of the labor shortage, DaVita had to bring in teammates from locations across the state of Georgia and South Carolina to work. These teammates were given hotel, lodging, per diem, and their hourly rate. The teammates in the STAR program and the travel teammates expenses caused the labor costs and operational expenses to escalate at the facility in which I was hired. The labor and financial crisis existed at Wylds Road at the time of my hire, under the management of Jaryl Erwin (white/40+). In comparison to me, Ms. Erwin was not given a corrective action but promoted to open a brand-new DaVita facility.

I independently followed the internal outline of trainings that the Facility Administrators (FA) are required to complete. The FA training included traveling to the corporate headquarters in Denver, Colorado twice. In addition, I successfully completed training regarding clinical goals and standards, teammate relations, and people services processes. It is the duty of Tammy Price, Group Facility Administrator, Marissa Freedman, Regional Operations Director, and Susan Bass, Clinical Support Specialist, to visit all facilities regularly and help as needed. The Wylds Road facility did not get more help. I did not struggle in my role as the Facility Administrator. When the administration of the clinic was turned over to me from Jaryl Erwin in late September 2016, Tammy Price should have initiated an audit of the facility to establish a baseline.

On or about, October 18, 2016, Biomed completed their monthly audit of September water records. It was discovered that some water checks were not done on time. This discovery lead to a review of all records from January 2016- October 2016. Almost, every technician and nurse had not been compliant with signing off the water check within the time limit to include the former Facility Administrator, Jaryl Erwin, RN (white/40+). In fact, the non-compliance with the timeliness of the water checks was also in 2015 under the administration of Ms. Erwin. I facilitated a homeroom (morning) discussion regarding water testing policies to the entire staff. In addition, I registered all teammates to retake the water testing class on-line, conducted an in-service, had bio-med to retest their skills, and had ongoing discussions during daily homeroom meetings.

At the point of the discovery of untimely water checks, I had only been a teammate of DaVita for four months and had only been solely managing

the facility for a few weeks.  GFA Tammy Price insisted upon writing up every teammate and told me to alert People Services of the issue.  Initially GFA Price only wanted to write up the patient care technicians (all black).  People Services stated the nurses had to be written up as well because they verified the time of the water level checks conducted by the patient care technicians.  I sat in the conference room and observed as GFA Price typed the corrective actions for all the teammates that violated the water check policy, even if it was 3 minutes late.  After GFA Price typed the corrective actions, I went to the treatment floor and individually asked the teammate to come to the conference room.  GFA Price guided the process.  When I submitted the final signed correctives actions to People Services, I made changes and crossed out to give lesser discipline to the newer teammates after learning that Jaryl Erwin did that for the nurse, Renee (white) in her clinic that GFA Price instructed her to write up for signing off late on the water checks.  GFA Price initiated and played a major role in the level of discipline issued to all teammates involved.  This may be verified by contacting some of the teammates that were written up:

| | |
|---|---|
| Earnestine Curry (black /PCT) | 706-231-3398 |
| Veronica Whitfield (black/PCT) | 706-231-0923 |
| Wanda Thomas (black/PCT) | 706-251-0687 |
| Suzanne Graham (black/PCT) | 706-664-4075 |

Please note that Marissa Freedman, Regional Operations Director, did not ever provide any hands-on direct coaching to me regarding clinical operations at a dialysis facility.  Marissa Freedman was/is not a clinician such as a nurse, just like I am not.  Ms. Freedman is a non-clinical ROD.  ROD Freedman was only concerned with the financial numbers at the end of the month.  The concern was for whether the clinic made a profit, not patient care.  A profit would lead to a substantial bonus in March of every year.

C. My performance improves the clinical outcomes of the clinic.

The issue is not my performance but that of how many patients each month met their clinical goal.  These standards impact the reimbursement rate for the facility.  The facility (Wylds Road) has never been profitable for DaVita.  It was discriminatory for GFA Price and ROD Freedman to hold me, a black woman, to a higher standard regarding clinical outcomes than that of Jaryl Erwin (white) the previous facility administrator who is a nurse.  Most of the patients at Wylds Road are federally insured and do not have private insurance.  Many of the patients are noncompliant with their medical treatment which is what primarily contributed to them being on dialysis.  I had mounting pressure to make sure the monthly clinical labs

were within limits for patients.  All teammates (PCTs/Nurses, the Dietician, and Social Worker) were advised by me to review and encourage patients to not miss appointments, to complete their treatment, and to watch their diet and fluid intake.  GFA Tammy Price did not conduct bi-monthly company calls regarding the status of the clinic.  Wylds Road clinical scores were not at the top tier when I assumed leadership, but they improved and were better than previous administrations.  In fact, when the rating for all clinics came out in October 2016, Wylds Road received a "2".  This score was based on the clinic performance under the leadership of Jaryl Erwin (who was promoted to open the brand-new clinic).  In August 2017, after I was terminated, the new score came out and Wylds Road had improved to a "3" on a scale of 1 to 5.

GFA Tammy Price cannot provide the date/time and notes in which my performance was discussed other than on the day she and Marissa Freedman arrived unannounced at the facility and gave me a PIP.  Tammy Price is uneducated.  She only has a technical degree as a Registered Nurse.  She is not qualified to be the Group Facility Administrator.  She is biased and exhibited a different standard with me than with white, young Facility Administrators.  In April 2017, I had a conversation with Deanna Jennings, RN (black/30+) a Facility Administrator in Greenwood, South Carolina.  Ms. Jennings questioned what my professional relationship with GFA Price was like.  Ms. Jennings disclosed and confirmed that GFA Price and ROD Freedman were racist.  Prior to Ms. Jennings one-year hire date with DaVita, GFA Price placed her on a Final Written warning and she had not ever had any prior corrective actions or a PIP.  Ms. Jennings described the discriminatory way she had been treated by GFA Price in comparison to the non-black Facility Administrators.  Ms. Jennings warned me of the wrath of GFA Price and ROD Freedman and advised me to be careful.

I coordinated and prepared the Wylds Road facility for federal and state recertification.  This huge task involved organizing all clinic files and ensuring everything was in place.  The Federal/State surveyor arrived unannounced at the facility on March 29, 2017.  As is company policy, I notified GFA Tammy Price and CSS Susan Bass that the surveyor had arrived.  At the end of the survey, the facility, under my leadership, successfully passed the survey.  I received accolades and accommodation from ROD Freedman, GFA Price, CSS Bass, Regional VP Paul Asper, and others.  The statement that I was failing in my role as FA is an outright lie.  The survey determines if the clinic can remain open for business.  I made that happen!  The facility was given 5 years of certification because of what I orchestrated at the clinic.

Exhibit G: Email sent out by Susan Bass after the completion of the survey.

GFA Tammy Price and ROD Marissa Freedman, began pressuring me to terminate the employment of Margaret Williams (black/Administrative Asst), Earnestine Curry (black/Patient care technician), and Karen Hernlen (white/ LPN). All three of the teammates had worked for DaVita 5 or more years under the management of several Facility Administrators. As instructed by GFA Price and ROD Freedman, I contacted People Services/Teammate Relations to discuss terminating the employment of the three. Unfortunately, I could not provide a recent incident to substantiate the need for immediate termination. People Services stated that the terminations were not justified. This information was conveyed to GFA Price who responded very lividly. GFA Price and ROD Freedman set up a joint conference call with People Services/Teammate Relations to discuss corrective actions for Ms. Williams, Ms. Curry, and Ms. Hernlen.

During the conference discussion with Teammate Relations, it was apparent that GFA Price became frustrated with me for not leading the discussion of why the corrective actions were necessary. I felt intimidated and as though I was being used to participate in a witch hunt and contrived plot to fire seasoned teammates. The performance of the three had not declined nor was it any different from when Jaryl Erwin was the Facility Administrator of Wylds Road. Ms. Erwin was never asked to terminate them from employment. At the end of the conference call, I was told over the next weeks to observe and document. I was also told to meet with them individually. I was told by GFA Price and ROD Freedman to terminate the employment of Ms. Williams and Ms. Curry. I was told to give Ms. Hernlen a final written warning because she did not have any previous corrective actions. Prior to executing the corrective actions, Ms. Williams and Ms. Hernlen resigned from their positions. Under personal duress, I executed the termination of Ms. Curry. GFA Price and ROD Freedman did not have a thought or care for the impact the resignations and termination of three long-term teammates would have on the morale of other teammates or the satisfaction of patients. After the termination of Ms. Curry, a few patients stopped speaking to me.

Exhibit H: Email from Marissa Freedman

I initiated and met with the core team (Clinical Coordinator, PD Nurse, Social Worker, and Dietician) every Monday to review patient labs, treatment compliance, and other clinical concerns. In addition, homeroom meetings were held 1-2 times a week. In-service trainings were also scheduled on off days but had to be discontinued because GFA Tammy

Price and ROD Marissa Freedman complained about the labor charge. Therefore, I had to circulate written policy and procedures for teammates to read and sign off acknowledging.

During my period of leadership as the Facility Administrator at Wylds Road the clinical outcomes of the facility improved.  The DaVita Quality Index (DQI) Scores were:

| | | |
|---|---|---|
| November 2016 | 33 | |
| December 2016 | 38 | |
| January 2017 | 40 | |
| February 2017 | 40 | (Wofford 33.3, Upstate 40) |
| March 2017 | 47.1 | (Pendleton 46.7, Aiken 35.3, Wofford 44) |
| April 2017 | 52.9 | (Wylds Road was out of the bottom 20%) |
| May 2017 | 52 | |
| June 2017 | 68 | (improvement after being given the PIP) |

These scores clearly indicate performance improvement and that the clinical outcomes were trending up.  In comparison, my white colleagues did not receive a corrective action when in the same months their clinical outcomes were equal or less than my clinic.  Those same white facility administrators are still employed with DaVita.

I was completely surprised when Tammy Price and Marissa Freedman arrived at the clinic unexpectedly on May 10, 2017, which was a day the clinic was not open for patients.  They came only to give me the Performance Improvement Plan.  The PIP was totally unexpected because my performance review in March 2017 gave me an overall rating of "3" out of "5".  I felt at the time that since I had not been in the position a year yet that the rating was reasonable.  I anticipated a higher rating the next year if I was still in that position.  Prior to receiving the PIP, GFA Tammy Price and ROD Marissa Freedman never discussed with me that I was failing in my role.  My PIP had the same tone as to what I had been asked to do to the teammates I was instructed to terminate; which was to go back and write me up for any and everything regardless if I was in charge or had been disciplined previously.  GFA Price and ROD Freedman were retaliatory towards me.  The PIP identified areas of concern that proceeded and was not included in the March 2017 performance review. The issues in my PIP were not addressed nor were they required of the white Facility Administrators (Jaryl Erwin, Nathan McClure, Michelle Loggins).

Exhibit I: Performance Review
Exhibit J: Performance Improvement Plan
Exhibit K: DaVita Performance Improvement Plan Policy

D. GFA Price and ROD Freeman instructed me to terminate employees.

On March 29, 2017, ROD Freedman and GFA Price summoned me into my office while the surveyor was in the conference room. I expected the meeting would discuss how the survey was going because it was occurring at that time. ROD Freedman and GFA Price instructed me to terminate Margaret Williams, Karen Hernlen, and Earnestine Curry. The instructions were clear. I was told to contact People Services. ROD Freedman followed up with an email to me summarizing the meeting. The attached email documents that the response from DaVita that they did not tell me to terminate employees is not true.

As instructed, I contacted People Services. The representative stated that there was not enough justification to terminate the employees. I telephoned GFA Price and she became livid. A few days later GFA Price and ROD Freedman set up a conference call with People Services/Teammate Relations to discuss terminating Ms. Williams, Ms. Hernlen, and Ms. Curry. During the conference call, GFA Price and ROD Freedman were upset when I did not take the lead and provide reasons as to why they should be terminated. All these teammates had been employed with DaVita for 5 or more years. At the end of the conference call, I was asked to document their performance and then give them a corrective action. I felt like I was the scapegoat to get rid of black teammates. The previous Facility Administrator, Jaryl Erwin (white), had not been pressured to terminate any teammates.

The PIP given to me by GFA Price and ROD Freedman states that I "delayed providing feedback to teammates and taking action on recommendations (Earnestine - delay in termination and Margaret - PIP not initiated or discussed, delay with documentation to Karen)". This shows that I was instructed by GFA Price and ROD Freeman to terminate their employment.

I confided in Krystle Robinson, the facility Clinical Coordinator at the time, the instructions that were given and allowed her to see the email from ROD Freeman. I discussed with CC Robinson the racial motivation behind the terminations. She agreed it was unjustified and was concerned with the staffing shortage that would be created. Days later CC Robinson stepped down from her position to just be a nurse. CC Robinson said she felt they were putting her in a position to lose her professional license if we did not have enough staff to work. She also stated it would be impossible to fulfill the duties of the Clinical Coordinator and work the treatment floor as a Nurse because of the impending staff shortage.

Krystle Robinson (black/CC)        704-726-8364

Exhibit L: Email from ROD Freeman

E. I was not considered for a promotion because I am Black. The decision to not promote me was not based on performance.

In February 2017, I reviewed the job description for the Outreach Development Manager and recognized that she met the qualifications. I then contact Natasha Jones, Leadership Recruiter. Ms. Jones, who is based out of Florida, became excited and encouraged me to apply for the position. In late May 2017, I followed back up with Ms. Jones regarding the status of the position, even though the PIP had been given at that time. Ms. Jones sounded surprised when I called and learned that no one had ever contacted me. She stated I was the most qualified candidate for the position. A white person with less qualifications was hired as the Outreach Development Manager. Ms. Jones then reviewed all available positions in which I could apply. On May 23, Ms. Jones reached out again to find out if I had applied for the vacant positions.

In March 2017, I was given my professional development review (annual performance evaluation) by GFA Price. The review period was January 1, 2016 – December 31, 2016. GFA Price gave me an overall rating of 3 (meets expectations).

The following beliefs and behaviors ratings were given:

| | |
|---|---|
| Service Excellence | 3 |
| Integrity | 3 |
| Team | 4 |
| Continuous Improvement | 3 |
| Accountability | 3 |
| Fulfillment | 4 |
| Fun | 3 |
| Business Acumen (as the Facility Administrator) | 3 |
| Building Trusting Relationships | 3 |
| Corporate Compliance | 3 |
| Coaching | 4 |
| Decision Making | 2 |
| Planning & Organizing | 3 |
| Managing Conflict | 3 |
| Leading Through Mission & Values | 4 |

The above ratings for 6 months of performance (I started working for DaVita 5/31/18) indicate that I did not have poor performance in the position of Facility Administrator. This rating was received during the same time in which I applied for the job promotion. I was deliberately denied the opportunity to interview for the promotional position of Outreach Development Manager.

My white younger counterpart, Nathan McClure was given a higher starting salary, higher performance review rating, and larger bonus than I received.  Just as I was, Mr. McClure is a non-clinical Facility Administrator.  He has less education and professional experience.  Mr. McClure was a medical school student drop-out prior to being hired as the facility administrator at South Augusta DaVita Dialysis.  I on the other hand have over 15 years of administrative experience.  GFA Price and ROD Freedman did not treat me the same as they did Mr. McClure.

The PIP was given to me in May 2017.  When a teammate is given a PIP, it disqualifies them from applying for another position in the company.  The performance issues listed in the PIP were never discussed nor documented prior to indicate concern.  Also, the performance issues stated were things that occurred in 2017 and I was not given a corrective action then nor were those things put in the professional development review I received two months prior in March.  The clinical trends of the clinic improved under my leadership in comparison to the year before (2016) under the management of Jaryl Erwin (white).  Again, GFA Price and ROD Freedman did not treat me the same as they did Ms. Erwin.

Exhibit M: Outreach Development Manager Job Description
Exhibit N: Professional Development Review

F.  Additional response information.

GFA Price (white) and ROD Freeman (white) acted discriminatory towards me in respect to my race and age.  I was not treated the same as her white, younger counterparts.  I was held to a different standard of performance in comparison.  I was hired as the Facility Administrator at the facility which had a predominantly black staff and predominately black patients.  The previous Facility Administrator (white female) at that facility was promoted to manage a predominantly white facility of teammates and patients.

The performance issues stated in the PIP were false and contradictory.  In addition to those already noted.  I made new teammates feel special with welcome banners and treated them to lunch on their first day of work. GFA Price just happened to be in the clinic on the first day of work for Krystle Robinson, RN and saw the banner on display.  GFA Price was invited to go to lunch with us, but she refused.  I did not initiate the facility putting up a wall of fame in April 2017.  It is an optional activity for a clinic. The priority in March and April was to be prepared for recertification. Nathan McClure (white/20+), Facility Administrator at the South Augusta DaVita location did not put up a "wall of fame" either.  But unlike me, Mr. McClure was not given a corrective action.  Nor did Mr. McClure's facility participate in Spirit Week activities in June 2017.  For Spirit Week at Wylds Road, I felt obligated since I had a PIP to participate, even though it was

optional.  I coordinated for staff and patients, a Hawaiian day, Princess day, and we planted a flower garden in the front and side of the clinic. Despite Mr. McClure, not initiating any "fun" activities at my clinic, he was given the golden child treatment and was assigned to also manage the Wylds Road facility when I was fired.

I assumed management of the Wylds Road facility in October.  The water check problem preceded my hiring.  Jaryl Erwin (white) was the Facility Administrator during the time of the late water checks.  She was not given a corrective action.  GFA Price wrote up all the teammates involved but did not give a corrective action to me.  I am not a technician/nurse, nor did I sign off on the water checks.  It is odd that seven months later, the responsibility for the late water check issues was included in the PIP for me but not noted in my professional development review two months prior. The PIP was given to me a few days after the final teammate on the short list for terminations of GFA Price and ROD Freeman either resigned or was terminated.  I was retaliated against for not expeditiously terminating the three seasoned teammates (2 black/1white).

Furthermore, DaVita policy was not followed regarding the PIP.  I did not have any reviews with GFA Price nor ROD Freeman during the 60 days.

Exhibit O: Performance Improvement Plan (PIP) Guidelines

III.   Legal Argument

My charge of race and age discrimination and retaliation are of merit.  These EEOC charges are a violation of the law.

A.  I, Dr. Kay Gresham can sustain a claim of race and age discrimination.

I was 52-year-old at the time of the firing, and I am a black woman.  My immediate supervisors were younger and white; ROD Marissa Freeman (30+) and GFA Tammy Price (40+).  My counterparts were Jaryl Erwin (white/40+), Michelle Loggins (white/30+) and Nathan McClure (white/20+).  The clinical trends of all three facilities were similar.  I, unlike my younger, white counterparts, was the only Facility Administrator placed on a Performance Improvement Plan.

I did not struggle to lead my team or manage the clinic.  The morale of the team improved under my leadership.  I was qualified for the role of Facility Administrator.  As for-mentioned, I have an earned PhD in Social Work Administrator. Furthermore, I was qualified for the promotion position in which I applied as the Division Outreach Development Manager.  I understood the clinical policies and procedures and implemented practices not previously put in place by the previous Facility Administrator, Jaryl Erwin, this created animosity and work-related resentment towards me by

her.  Teammates had regular morning (homeroom) meetings; the Core team meet every Monday to review patient clinical outcomes; in-service trainings were held on no treatment facility days; record books were created for organizational purposes; expenses were reduced (less teammates were allowed to work, new vendors were selected to reduce costs such as janitorial and lawn care), and numerous requests were made for facility repairs (the outside back door, dialysis machines, the scale, etc.).

The most significant action taken to reduce expenses was changing the facility treatment days from 6 days a week to 3 days a week.  The number of teammates working every day was reduced from 10 to 6.  In addition, when the patient census reduced during the day, teammates clocked out.  The patients did not like me sending teammates home.  Their concern was for patient safety.  Patients made formal complaints regarding not having enough teammates working the treatment floor.  The number of teammates I was mandated by GFA Price and ROD Freedman to work every day was greatly less than the previous Facility Administrator, Jaryl Erwin was required to use and the same applies to Nathan McClure at the South Augusta and Wylds Road location after I was fired.  The Georgia Department of Community Health investigated the allegation of patient safety on August 11, 2017 (1 month after my termination and the violation was substantiated.  My white counterparts, Nathan McClure and Jaryl Erwin, worked more teammates daily at the Wylds Road facility without any reprimand.  I felt as though I was being set -up to fail after it was demanded to only work six teammates a day.  Subsequently, some nurses and technicians had to work more than 12 hours in a day, which is a patient care safety hazard.

B.  I, Dr. Gresham, can sustain a claim of retaliation.

I was told by GFA Tammy Price and ROD Marissa Freedman to terminate the employment of Margaret Williams, Earnestine Curry, and Karen Hernlen.  This is documented in the attached copy of email sent from ROD Freedman and in the PIP, which stated I delayed giving the identified teammates corrective actions. People Services was contacted March 30, 2017 regarding these teammates.  I expressed my apprehension regarding the termination to my next in command at the clinic, Clinical Coordinator Krystle Robinson, RN.  I did not engage in a conversation regarding discriminatory practice with GFA Prince nor ROD Freedman for fear of losing my job.  I felt conflicted because it became apparent that they hired me, a Black person, to get rid of the Black teammates that were outspoken.

Two of the three teammates (Ms. Hernlen and Ms. Williams) sensed the hostile climate of the facility brought on my GFA Price and ROD Freedman and resigned prior to me administering corrective actions to them.  Under

duress from GFA Price and ROD Freedman, I fired Ms. Curry.  Days later, GFA Price and ROD Freedman, showed up at the facility and placed me on a PIP.  The PIP was retaliatory for me not staying in my place as a Black person, who was supposed to be a place holder and immediately jumping to do as I was told.

The retaliation was also because I applied for the promotional Division position, Outreach Development Manager (I would have been higher in status to GFA Price and equivalent to ROD Freedman).  I was not discriminated against by also not granting me an interview which is the mandatory policy for teammates in good standing that apply for a position.

Further the retaliation is because I had also submitted a request for reimbursement of tuition.  After several weeks of no response to the reimbursement request, when I inquired, I was finally told by GFA Price and ROD Freedman that it would not be approved because I did not get permission to go to school.  As an employee of DaVita, I was eligible to receive $3000 in tuition reimbursement per year.

C. DaVita's basis for the PIP and my termination was not legitimate.  The firing was discriminatory, due to my African American nationality and pretextual.

My performance did not warrant the PIP nor my termination.  The facility clinical outcomes improved during my management resulting in the clinic going from the "2" facility rating under the leadership of Jaryl Erwin (white/40+) to a rating of "3" for the period I was in leadership.  Furthermore, the resources and support given to me was less than what was provided to Nathan McClure (White/ 20+).  My charge of race and age discrimination is not subjective, but objective and based upon facts.

IIII. Conclusion

As set forth above, my charges of race and age discrimination and retaliation are entirely supported.  Additional supporting documents have been attached: emails from ROD Freedman, GFA Price, and CSS Bass; policies, payroll stubs, and other letters which substantiate probable cause.  I respectfully request that these charges remain open and that a violation of the law is found against DaVita.  I am also requesting that these EEOC charges move forward expeditiously to the next step in the EEOC charge process due to numerated, systematically proven and previously listed violations of race and age discrimination and retaliation.

Sincerely,

*Kay L. Gresham*

Kay L. Gresham, PhD

Witnesses to the Discrimination and Retaliation I Received:

| | | |
|---|---|---|
| Earnestine Curry, PCT | (Black/60+) | 706-231-3398 |
| Margaret Williams, AA | (Black/ 60+) | 518-770-1449 |
| Jacquelyn Taylor, LPN | (Black/40+) | 229-444-0203 |
| Krystle Robinson, RN | (Black/30+) | 704-726-8364 |
| Michele Etienne, MSW | (Black/30+) | 706-294-0518 |
| Sarah Harrison, RN | (Black/30+) | 706-664-3770 |
| Veronica Whitfield, PCT | (Black/30+) | 706-231-0923 |
| Wanda Thomas, PCT | (Black/30+) | 706-251-0687 |
| Simone Crocklen, PCT | (Black/40+) | 609-744-6478 |
| Veronica Stone, AA | (Black/50+) | 706-306-8941 |
| Susan Bass, RN | (White/40+) | 803-535-9137 |
| Yvette Gaye, LPN | (Black/30+) | 706-401-2461 |
| Jeane Klozer-Reese, FA | (White/60+) | 706-825-5369 |
| Valencia Colquitt-Reynolds, PCT | (Black/40+) | 229-444-4797 |
| Sherrick Bass, LPN | (Black/20+) | 706-627-5424 |
| Karen Hernlen, LPN | (White/40+) | 706-726-5678 |
| Deanna Jennings, FA | (Black/30+) | 864-993-5954 |
| Jaryl Erwin, FA | (White/40+) | 706-755-9369 |
| Nathan McClure, FA | (White/20+) | 706-726-7053 |

(Please note that some of these witnesses are still employed with DaVita and may be afraid to talk but they can attest to facts; especially regarding the improvement of clinical outcomes under my leadership and the corrective action taken against me in comparison to my white counterparts with similar challenges at their facility.)